UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MINERVA SCHLAMOWITZ,

               Plaintiff,

       - against -

RAQUEL TIRADO,

               Defendant.
--------------------------------------------------------------X

**MEMORANDUM
AND    ORDER**

12 CV 504 (CLP)

On February 2, 2012, Minerva Schlamowitz ("plaintiff") commenced this suit against her sister Raquel Tirado ("defendant"), alleging that defendant owed her repayment on a loan in the amount of $180,000,[1] no part of which has been repaid to plaintiff despite demands for repayment. (Compl.[2] ¶ 4).

On March 14, 2014, the parties consented to have the case tried before the undersigned, and a bench trial was held on May 13, 2014. Having considered the testimony, evidence, and arguments presented by the parties at trial, the Court finds that defendant owes plaintiff a total of **$89,249.48** for the reasons set forth below.

## FACTUAL BACKGROUND

During the May 13, 2014 trial, it became clear that both parties agreed that Schlamowitz had lent her sister Tirado monies over a five year period, beginning in 2007. It is also undisputed

---

[1] Although plaintiff alleged in her Complaint that the loan was in the amount of $180,000, at trial, plaintiff claimed that defendant actually owes her $220,400. (Transcript of the Trial of May 13, 2014 ("Tr.") at 6, 15).

[2] Citations to "Compl." refer to plaintiff's Complaint, filed February 2, 2012.

1

that the terms of the agreement were never reduced to writing. Thus, the key issues for trial were: 1) how much money had Schlamowitz lent to Tirado; 2) how much, if anything, had Tirado repaid; and 3) whether the parties had reached an agreement as to interest.

During the trial, the parties stipulated that there were transfers in the amount of $142,500 loaned from plaintiff to defendant. (Tr. at 5). It is plaintiff's position that an additional $77,900 was loaned to the defendant, for a total amount owed of $220,400. (Id. at 5-6; Joint Rpt[3]). This additional $77,900 amount allegedly consists of $60,000 in undocumented cash loans, a documented $10,000 cash withdrawal by plaintiff in Massachusetts that she claims was loaned to Tirado, and $7,900 from two additional documented cash withdrawals plaintiff made in New York that were also allegedly loaned to defendant. (Joint Rpt; Tr. at 6, 12-13; Ex. A[4] at 429; Ex. B at 405; Ex. C at 290).

Defendant denies receiving the $77,900 in additional cash loans. (Tr. at 22). Instead, defendant contends that not only did she never receive these amounts, but in fact, she repaid a total of $76,902 to plaintiff. (Joint Rpt; Tr. at 22-23). Tirado alleges that this $76,902 repayment is comprised of $69,920 made through deposits to plaintiff's accounts, evidenced by defendant's deposit slips, and a $7,000 undocumented cash repayment. (Id.; Ex. J). Plaintiff denies receipt of the undocumented $7,000 in cash, and claims that the $69,920 in deposits to plaintiff's accounts was in fact interest owed on the loans, and not repayment of principal. (Joint Rpt; Tr. at

---

[3]Citations to "Joint Rpt" refer to the Joint Report on Proposed Damages Calculations, filed by the parties on June 17, 2014.

[4]Citations to "Ex." refer to the defendant's exhibits. Exhibits A, B, and C contain the Exhibits of the Proposed Pretrial Order submitted by defendant, filed on May 1, 2014. Citations to Exhibits H, I, J, and K refer to the Defendant's Trial Exhibits.

19-20).

Set forth in the table below is a summary of the parties' respective positions. Plaintiff believes she is due $220,400 (the stipulated amount of $142,500, plus a disputed $77,900 in additional loans), while defendant believes plaintiff is only due $65,580 (the stipulated amount of $142,500, minus the disputed repayment of $76,902). (Joint Rpt). Plaintiff and defendant were the only witnesses who testified at trial.

| Amount Owed (Plaintiff) | Amount Owed (Defendant) |
|---|---|
| + $142,500 loaned through transfers | + $142,500 loaned through transfers |
| + $60,000 undocumented cash loans from home | − $69,920 repayments of principal from transfers to plaintiff's account (evidenced by deposit slips) |
| + $10,000 cash loan (withdrawal in Massachusetts) | − $7,000 cash repayment |
| + $5,500 cash loan (withdrawal in New York) | |
| + $2,400 cash loan (withdrawal in New York) | |
| Total: $220,400[5] | Total: $65,580 |

A.    Testimony of Minerva Schlamowitz

At trial, plaintiff Minerva Schlamowitz testified that she loaned her sister, Raquel Tirado money for defendant's business expenses. (Tr. at 10). Schlamowitz testified that Tirado promised to withdraw money from a certificate of deposit to pay back the loan in full once the plaintiff needed the money, but, according to plaintiff, her sister did not repay any of the loan

---

[5]Although plaintiff alleged at trial that there was an interest agreement of $2,500 per month (Tr. at 19-20), she has not specifically included a calculation of that amount in her request, limiting her claim to repayment of alleged principal totaling $220,400.

when a request for repayment was eventually made. (Id. at 14-15). Schlamowitz stated that defendant did periodically pay her interest on the loan and that defendant's deposit slips, submitted to the Court as Exhibit J, are evidence of these periodic interest payments. (Id. at 10, 14; Ex. J). Schlamowitz claimed that she and her sister had an interest agreement, whereby defendant would pay $2,500 a month in interest. (Tr. at 19-20). However, Schlamowitz testified that defendant would sometimes pay less than the agreed upon amount, or no interest at all depending on how much money defendant could repay each month. (Id.)

Since the parties stipulated that Schlamowitz lent Tirado at least $142,500, the testimony at trial focused on the additional $77,900 that plaintiff claimed she had loaned to defendant and the $76,920 defendant claimed to have repaid plaintiff. During direct examination, plaintiff's counsel pointed to plaintiff's bank records reflecting three cash withdrawals plaintiff made on July 17, 2008, January 28, 2010, and June 3, 2010, totaling $17,900. (Id. at 11-13). Schlamowitz testified that these three withdrawals were all cash loans made to the defendant. (Id.) According to plaintiff, the January 28, 2010 withdrawal of $10,000 was made from plaintiff's account in Massachusetts, where defendant resides. (Id. at 12). The July 2008 and June 2010 withdrawals were made in New York, where plaintiff resides. (Id.) On cross-examination, Schlamowitz claimed that the January 2010 Massachusetts withdrawal was made when plaintiff visited the defendant in Boston for one week and the $10,000 in cash was given to Tirado as a loan. (Id. at 18-19). Schlamowitz further claimed that the two New York cash withdrawals from July 2008 and June 2010 represent sums loaned to defendant when defendant came to New York to visit. (Id. at 17-18).

Schlamowitz also testified that she loaned defendant an additional $60,000 dollars in cash

4

that is not reflected as a withdrawal in the bank statements because she saved it at home and not at the bank. (Id. at 13). Schlamowitz claimed that the cash that she saved at home came from her husband's pediatric practice, where she works as an assistant and handles the money. (Id.) On cross-examination, she testified that the $60,000 in saved cash from her husband's business was loaned to defendant periodically over five years. (Id. at 16, 17).

Schlamowitz conceded that, other than her own sworn testimony and the bank statements introduced into evidence, she has no further evidence to prove that any of the cash payments in dispute were made to the defendant. (Id. at 19). Furthermore, Schlamowitz testified that she has no other evidence to prove that the defendant's $69,920 in deposits to her account were in fact interest payments. (Id.) In total, Schlamowitz claims that she loaned $220,400 to the defendant, none of which was repaid. (Id. at 14-15; Joint Rpt).

### B. Testimony of Raquel Tirado

The defendant, Raquel Tirado, claimed that plaintiff only loaned her $142,500. (Tr. at 51). Tirado categorically denied receiving any of the cash payments that plaintiff claimed were made. (Id. at 22). Tirado testified that the only time cash was exchanged in this financial arrangement between plaintiff and defendant was when Tirado made a $7,000 cash repayment to plaintiff witnessed by their mother, Zulena Calcano, and defendant's assistant in defendant's home in Massachusetts. (Id. at 23, 26). However, Tirado did not call any of these witnesses to testify about this alleged cash repayment and has no records showing that such a cash repayment was made. (Id.)

Tirado also denied the existence of any agreement as to interest, stating repeatedly that "we never talked about interest." (Id. at 23, 41, 43, 44, 48). Instead, she testified that the

5

$69,920 in deposits she made to plaintiff's account[6] were repayments of principal on the loan, which she made approximately once a month as part of a cycle of loans and repayment agreed upon with her sister. (Id. at 42-44). Tirado claimed that sometimes she borrowed money, repaid it, and borrowed more all in quick succession because sudden, pressing business expenses like "gas" and "insurance" for her transportation company would arise and require her to ask her sister for more money immediately. (Id. at 44). When questioned about scribbled out notes on the deposit slips that she provided as evidence of the repayments, Tirado stated that she did not remember what the notes had said, but that they could have been notes to herself, like phone numbers. (Id. at 48). She testified that she did not tamper with these deposit slips, and that "they were already like this" when she searched and found them for use in this lawsuit. (Id.)

Additionally, Tirado testified that she was in fact mistaken when she testified at her deposition that she had not made deposits to the joint account she shared with the plaintiff. (Id. at 30-33). She did in fact make deposits to the joint account, and both sides stipulate to that. (Id.) Tirado was also questioned about her deposition testimony where she testified that she suspected someone had broken into her home and stolen her bank records. (Id. at 35). When questioned at trial, Tirado confirmed that she had no proof that a break-in had occurred, only suspicions, but she conceded that Schlamowitz's counsel had no involvement in such a crime. (Id. at 35-38).

C.    Documentary Evidence

The only documents entered into evidence at trial consist of various Bank of America

---

[6]Although the sisters shared a joint account at Bank of America (account number 9988), these deposits were to plaintiff's account bearing account number 6805.

6

account statements held in the name of either plaintiff or defendant, defendant's deposit slips, and an accounting report from Shalik, Morris & Company LLP,[7] analyzing the bank statements. The parties stipulate to the accuracy of the exhibits.

## DISCUSSION

I.  Legal Standards

    A.  Choice of Law

This case is brought pursuant to 28 U.S.C. § 1332 and based on the diversity of the parties. In diversity actions, federal courts follow the choice-of-law rules of the forum state to determine the controlling substantive law. Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 191 (S.D.N.Y. 2006) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938)). Since the action was brought in the Eastern District of New York, New York choice of law principles govern. Crescent Oil & Shipping Servs., Ltd. v. Phibro Energy, Inc., 929 F.2d 49, 52 (2d Cir. 1991).

In contract disputes, New York courts apply the law of the jurisdiction having the greatest interest in the litigation. Id. The factors generally considered by courts in determining which state has the greatest interest include: the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties.

---

[7]In the accounting report, submitted as plaintiff's Exhibit G, plaintiff's accountants concluded that they could verify $130,300 in transfers from Schlamowitz to Tirado. However, the parties stipulated to an agreed upon amount of $142,500 in transfers from Schlamowitz to Tirado. From the Court's review of the accounting report, it is not evident where or when the remaining $12,200 loan was made. However, as the parties stipulated at trial to $142,500 as the amount owed to Schlamowitz (see Joint Rpt., Tr. at 5), the Court credits their accounting.

Ackerley Media Grp., Inc. v. Sharp Elecs. Corp., 170 F. Supp. 2d 445, 450 (S.D.N.Y. 2001); see also Pegasus Aviation IV, Inc. v. Aerolineas Austral Chile, S.A., No. 08 CV 11371, 2012 WL 967301, at *5 (S.D.N.Y. Mar. 20, 2012) (considering each of the factors in a choice of law analysis).

In this action, neither party has addressed the question of whether New York or Massachusetts law applies. Under New York law, the law of the forum state in this case, "a party wishing to apply the law of a foreign state [must] show how that law differs from the forum state's law. Failure to do so results in the application of New York law." Haywin Textile Prods., Inc. v. Int'l Fin. Inv. & Commerce Bank Ltd., 152 F. Supp. 2d 409, 413 (S.D.N.Y. 2001). Neither party in this case has indicated that she wishes to apply Massachusetts law, and thus New York law applies. Moreover, while the plaintiff resides in Massachusetts, and the location of the formation and negotiation of the original oral loan agreement in this case is unclear, the vast majority of performance on the contract occurred in New York. Plaintiff loaned the majority of the money for which she now seeks repayment in New York, including the $142,500 stipulated to by both parties. (Ex. H; Tr. at 5). While plaintiff claims that she made a $10,000 loan to defendant in Massachusetts, this amount, plus the alleged $69,920 in deposits and the $7,000 cash repayment that defendant claims took place in Massachusetts, are less than the amount loaned in New York. (Tr. at 6, 7). Thus, although the parties live in different states (New York and Massachusetts) and there were loans and repayments made in each of those states, the Court finds that the majority of performance on the contract took place in New York. (Id. at 17-18). Accordingly, given that neither side has urged application of Massachusetts law, the Court applies the substantive law of the state of New York.

8

B.    Existence of a Binding Oral Contract

Under New York law, to recover for a breach of contract, plaintiff must establish by a

preponderance of the evidence: "'(1) the existence of an agreement; (2) the adequate performance

of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'"

Friedman v. Schwartz, No. 08 CV 2801, 2011 WL 6329853, at *3 (E.D.N.Y. Dec. 16, 2011)

(quoting Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d

168, 177 (2d Cir. 2004)). In this case, the alleged contract was oral; there was no writing setting

forth the terms of the arrangement between the parties.

New York General Obligations Law Section 5-701 details the types of agreements

required to be made in writing:

> Every agreement, promise or undertaking is void, unless it or some
> note or memorandum thereof be in writing, and subscribed by the
> party to be charged therewith, or by his lawful agent, if such
> agreement . . . [b]y its terms is not to be performed within one year
> from the making thereof or the performance of which is not to be
> completed before the end of a lifetime.

N.Y. Gen. Oblig. Law § 5-701(a)(1). Thus, New York law recognizes the existence of oral

contracts under certain prescribed conditions. Winston v. Mediafare Entm't Corp., 777 F.2d 78,

80 (2d Cir. 1985). Under New York law, a written agreement is not necessary in personal loan

cases so long as the contract can be performed within one year of its formation and performance

is in fact completed before the end of a lifetime. Micena v. Katz, 68 A.D.3d 826, 827, 890

N.Y.S.2d 619, 621 (2d Dep't 2009) (finding that contracts are only void under the statute of

frauds if the contract "ha[s] absolutely no possibility in fact and law of full performance within

one year") (internal citation omitted); Ferrer v. Samuel, 192 Misc. 2d 533, 535, 746 N.Y.S.2d

242, 243 (Nassau County Dist. Ct. 2002) (citing N.Y. Gen. Oblig. Law § 5-701). Performance of

the oral loan agreement in this case commenced the same year it was formed, when plaintiff began to loan money to defendant in 2007; the agreement could have been completed within one year, and was completed before the end of either party's lifetime. (Tr. at 25). Thus, the contract in question does not need to be written.

Nevertheless, it must first be shown that the oral contract in question was sufficiently definite in its terms to be considered enforceable. "Few principles are better settled in the law of contracts than the requirement of definiteness. If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482, 548 N.Y.S.2d 920, 923, 548 N.E.2d 203, 206 (1989). Even where the parties "believe they are bound, if the terms of the agreement are so vague and indefinite that there is . . . no means by which such terms may be made certain, then there is no enforceable contract." Deligiannis v. PepsiCo, Inc., 757 F. Supp. 241, 256 (S.D.N.Y. 1991). Therefore, where a contract does not have such essential terms as the time or manner of performance or price to be paid, the contract is unenforceable. Cleveland Wrecking Co. v. Hercules Constr. Corp., 23 F. Supp. 2d 287, 292 (E.D.N.Y. 1998).

However, New York courts "ha[ve] not applied the definiteness doctrine rigidly." 166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp., 78 N.Y.2d 88, 91, 571 N.Y.S.2d 686, 687, 575 N.E.2d 104, 105 (1991). "[W]here it is clear from the language of an agreement that the parties intended to be bound and there exists an objective method for supplying a missing term, the court should endeavor to hold the parties to their bargain. Striking down a contract as indefinite and in essence meaningless is at best a last resort." Id. (internal quotation marks and citation omitted).

10

When ruling on the definiteness of a contract, "[w]hat is looked to . . . is not the parties' after-the-fact . . . subjective intent" given during testimony at trial, "but their objective intent as manifested by their expressed words and deeds at the time" the agreement was made. Cleveland Wrecking Co. v. Hercules Constr. Corp., 23 F. Supp. 2d at 292 (quoting Reprosystem, B.V. v. SCM Corp., 522 F. Supp. 1257, 1275 (S.D.N.Y. 1981)), rev'd in part on other grounds, 727 F.2d 257 (2d Cir.), cert. denied, 469 U.S. 828 (1984). In this case, the parties disagree as to the material terms of the oral agreement. The testimony given at trial was unclear as to when and where the agreement was made and what the actual terms of the agreement were. There is no objective evidence from which to determine the agreed upon duration of the loan, the timing of any repayment, or whether it was agreed that the defendant would pay interest on the loan. What is known is that plaintiff agreed to loan money to defendant and defendant agreed to pay that money back. What is also not disputed is that there were a series of loans made over time by plaintiff, and there were periodic, non-regular payments of monies by defendant over a period of five years. (Tr. at 25; Exs. H, I).

Courts have held that, in endeavoring to hold parties to their agreements and avoid invalidating mutually agreed upon contracts for indefiniteness, "a method for reducing uncertainty to certainty might, for example, . . . [be] ascertained by reference to an extrinsic event, commercial practice, or trade usage . . . ." Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d at 483, 548 N.Y.S.2d at 923, 548 N.E.2d at 206. Specifically, a prior course of dealings between the parties may be used as "an objective criteria" that can inform the definiteness of the terms of the oral agreement in question. Eli Attia Architects v. Safra, No. 94 CV 2928, 1996 WL 480721, at *4 (S.D.N.Y. Aug. 23, 1996) (upholding the definiteness of an

oral contract between a builder and his client based upon the terms of prior arrangements between them). In this case, plaintiff and defendant previously entered into an almost identical loan agreement in 2004. Both parties agree that the terms of this prior loan agreement were that plaintiff would incrementally loan defendant an unfixed amount of money as needed and defendant would repay that money when requested. (Tr. at 9, 25). That appears to be what occurred for the 2007 loan agreement at issue in this case as well. (Id.) There does not appear to have been any agreement as to interest payments in connection with the 2004 loan, nor does it appear that the parties agreed to a specific deadline for repayment. (Id.)

Considering the terms of this prior 2004 loan agreement in understanding the essential terms of the loan agreement in question, there is sufficient reason to believe that the second oral loan agreement – the one in question – was of the same style and had the same essential terms as the prior 2004 agreement. There was no specific amount, time limit, or schedule for loaning, and repayment would occur when requested and when possible. The performance on the second loan agreement, which was incremental and non-regular by both parties, confirms this claim. (Exs. H, I).

Although the parties disagree as to whether interest was required, this genuine disagreement about interest is not enough to void the entire oral contract for indefiniteness given the definiteness of the other essential terms of the contract. See Cohen & Sons v. Lurie Woolen Co., 232 N.Y. 112, 114, 133 N.E. 370, 370-71 (1921) (finding that voiding a mutually assented contract for indefiniteness is "at best a last resort," and is only to be done when construction of essential terms regarding "subjectmatter [sic], time, and price" are completely futile). Thus, even if there is a disagreement as to interest (see discussion infra at 16-20), this disagreement does not

12

render construction of the agreement entirely futile. Therefore, the Court finds that the terms of the oral loan agreement in this case were sufficiently definite and certain, though purposefully non-specific, to fulfill the definiteness requirement.

In addition to definiteness, oral contracts, specifically, must pass a further requirement to be enforceable. The parties must have shared a mutual intent to be bound by their oral agreement in order for the oral contract to be enforceable. See Friedman v. Schwartz, 2011 WL 6329853, at *4-5; see also Shaftel v. Dadras, 39 F. Supp. 2d 217, 225 (E.D.N.Y. 1999) (citing Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d 320, 323 (2d Cir. 1997)). This is to ensure that people can "control whether and when tentative proposals become binding," Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d at 323, so that "parties are not trapped into 'surprise contractual obligations that they never intended'" to be made orally. Cleveland Wrecking Co. v. Hercules Constr. Corp., 23 F. Supp. 2d at 292-93 (quoting Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 71-72 (2d Cir. 1989)).

The Second Circuit has articulated a four-factor test to determine whether the parties intended to be bound by their agreement: "(1) whether there has been an express reservation between the parties not to be bound absent a formal writing; (2) whether one party has partially performed the contract; (3) whether there are material terms left to be negotiated; and (4) whether it is the type of agreement that is usually reduced to a writing." Shaftel v. Dadras, 39 F. Supp. 2d at 225-26 (citing Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d at 323). No single factor is decisive, but each provides significant guidance. R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74–75 (2d Cir. 1984).

In this case, all four prongs are met. First, there is no evidence that either party expressed

13

reservations about being bound by the oral agreement, absent a formal writing. On the contrary, in her testimony, defendant agreed that she entered into an oral loan agreement with plaintiff, and that she is bound to repay what plaintiff loaned to her. (Tr. at 25). Plaintiff brings this suit because she clearly intended for her oral loan agreement with defendant to be binding as well. Therefore, both parties were satisfied with the loan agreement being solely oral, and expected that oral agreement to be binding.

In regards to the second prong, both parties at least partially performed the contract. Both parties stipulate that plaintiff did loan defendant at least $142,500 and that defendant did deposit $69,920 into plaintiff's account. (Id. at 5). Plaintiff contends that these deposits were interest payments; defendant claims the deposits were repayments of principal. (Id. at 19-20, 23). Without passing on the merits of their arguments, it remains clear that defendant's payments constitute partial performance on the oral loan agreement.

As for the third prong, although the parties dispute what the original terms of the contract were with respect to interest, neither party disputes the fact that the terms of the loan were agreed upon when the oral agreement was entered into, and were not left open for future negotiation. Plaintiff testified that the parties originally agreed that $2,500 in interest was to be paid monthly. (Id.) Defendant testified that there was never an agreement to pay interest, and that the original agreement was to only repay the loan principal. (Id. at 42-44). Despite this factual dispute about interest, there is no evidence that there were terms left to be negotiated in the future.

In regards to the fourth prong, it is not unusual that a simple, personal loan agreement between sisters was not reduced to formal writing. See Friedman v. Schwartz, 2011 WL 6329853, at *4 (holding that an oral loan agreement was not of a nature expected to be written

14

because of its simplicity and the close relationship between the parties); see also Ciaramella v. Reader's Digest Ass'n, Inc., 131 F.3d at 326 (finding that "the complexity of the underlying agreement is an indication of whether the parties reasonably could have expected to bind themselves orally"). Thus, all four prongs of the test are met.

Indeed, utilizing this same four-prong test, courts have consistently upheld the legitimacy of oral contracts similar to the one in this case when there was sufficient evidence that an agreement occurred and was intended to be binding. See Friedman v. Schwartz, 2011 WL 6329853, at *6 (upholding the existence of a $100,000 oral loan agreement between business partners); Ferrer v. Samuel, 192 Misc.2d at 535-36, 746 N.Y.S.2d at 243-44 (upholding the existence of a small oral loan agreement between a woman and her ex-boyfriend under New York Law); see also Shaftel v. Dadras, 39 F. Supp. 2d at 226 (denying motion for summary judgment based on evidence that oral contract between two architects was intended to be binding). Thus, in this case, it is clear that both parties did intend for their oral agreement to be binding, and that the existence of this oral contract is legitimate and enforceable under New York law.

## II.    Factual Disputes

While both parties agree that an enforceable oral contract was made between them, there are factual disputes as to the amount loaned to defendant and the amount repaid to plaintiff. In order for the Court to properly enforce this contract, there are four key factual disputes that must be adjudicated. The first is whether the parties agreed that interest would accrue on the loan, and whether to treat defendant's deposits of $69,920 to plaintiff as interest payments, as plaintiff

15

alleges, or repayments of principal, as defendant claims. The second issue is whether or not plaintiff's three cash withdrawals totaling $17,900 are to be treated as loans to defendant. Third, the Court must determine whether to credit plaintiff's assertion that she loaned defendant an additional $60,000 in cash that she had saved at home. Finally, the Court must determine whether or not to credit defendant's claim that she repaid plaintiff $7,000 in cash. These issues will be discussed individually below.

A.    Defendant's Deposits

The first question is whether the parties reached an agreement on interest and whether the $69,920 in deposits to plaintiff's account were interest payments, as plaintiff alleges, or repayments of principal, as defendant claims. The evidence regarding this issue consists of defendant's deposit slips showing $69,920 in deposits to plaintiff's Bank of America account number 6805, a selection of plaintiff's bank statements for account number 6805 that confirms many of these deposits, and an accounting report summarizing these transfers. (Exs. G, I, J). It is plaintiff's position that these deposits were interest payments made by the defendant in accordance with the agreement reached between the parties that defendant would pay $2,500 per month in interest to plaintiff.[8] (Id. at 14, 19-20). Plaintiff testified that this was an oral agreement, and that she has no written evidence to substantiate her claim that the deposits were interest payments. (Id. at 19).

Plaintiff's counsel argued, however, that the pattern of payments between plaintiff and

_____

[8]Plaintiff testified that although the agreement was for defendant to pay $2,500 per month in interest, some months defendant would pay less. (Tr. at 19-20).

defendant do not make sense if defendant's deposits were principal repayments. During cross examination, plaintiff's counsel pointed to two series of transactions in the bank statements. In the first set of transactions, defendant deposited $4,000 into plaintiff's account on August 13, 2007; plaintiff then made a pair of $3,000 loans to defendant a week later on August 21, 2007 and then on August 27, 2007. (Id. at 43; Ex. E at 120). The second set of transactions shows that defendant made a deposit of $5,600 into plaintiff's account on October 10, 2007 even though she had just borrowed $5,000 six days earlier. She then borrowed another $5,000 on October 23, 2007. (Tr. at 44; Ex. J at 1015). In his summation, plaintiff's counsel argued: "Who borrows $5,000, to repay $5,000, to borrow $5,000 in a two week period? That's not how you [repay] principal on a loan. That sounds more like interest." (Tr. at 56). Plaintiff's counsel also argued that the scribbled out text on the deposit slips was evidence that defendant is hiding notations that these deposits were actually intended as interest payments. (Id. at 48). Finally, counsel contends that a lack of signatures on these slips calls into question who made these deposits. (Id.)

It is defendant's position that these deposits were repayments of principal on the loan, and that there was never an agreement between defendant and plaintiff, oral or otherwise, that interest would be owed or paid on the loan. (Id. at 42-44). Responding to plaintiff's argument about the pattern of payments, defendant testified that sometimes she borrowed money from her sister, repaid it, and loaned more in succession because sudden, pressing business expenses for her transportation company would arise and require her to ask for more money immediately. (Id. at 44). Additionally, defense counsel argued that the amount paid to plaintiff in deposits is simply too high to be interest payments. In his summation, counsel argued that if the $69,920 were

17

interest, the interest rate would be around 50%, which would be considered a usurious rate. (Id. at 52). Looking at just the first few transactions, defendant noted that there was "approximately $5,000 lent and a $2,000 deposit a couple weeks later." (Id. at 51-52). He questioned how such large amounts could possibly be interest. (Id. at 51-52).

With no documentation to verify the existence of an interest agreement or the terms of such an agreement, the Court is left with only the record of transactions between plaintiff and defendant and the conflicting testimony of plaintiff and defendant. After considering all of the testimony, evidence, and arguments in this case, the Court finds that plaintiff has failed to demonstrate by a preponderance of the evidence her claim that these deposits were interest payments and not repayments of principal.

First and foremost, the Court is persuaded by defendant's counsel's argument that the deposits are too large to be interest. Analysis of the plaintiff's bank statements in conjunction with the accounting report reveals that during the first two years of the loan, plaintiff loaned defendant approximately $88,450;[9] during that same period, defendant paid plaintiff $63,520.[10] (Ex. G at 1035-1036; Exs. H, I, J). If these were solely interest payments as plaintiff claims, the interest paid would be at the rate of 71.8%, an amount way beyond a reasonable interest rate. Cf. N.Y. Banking Law § 14-a(1) (limiting interest rate in New York to 16%); O'Donovan v. Galinski, 62 A.D.3d 769, 769-70, 878 N.Y.S.2d 443, 444-45 (2d Dep't 2009) (holding that repayment at annualized rate of 31% violated New York's usury laws). Not only is it absurd to

---

[9]This number includes only verified loans plaintiff made to defendant – $57,300 in 2007, and $31,150 in 2008.

[10]Defendant's transfers to plaintiff totaled $34,840 in 2007 and $28,680 in 2008.

18

think that anyone would borrow money at an interest rate of 70%, but Schlamowitz's testimony was that the agreement required interest payments of $2,500 per month regardless of the amount borrowed. (Tr. at 19-20). The repayments in this case simply cannot be explained as interest payments alone absent any documentation or compelling evidence to corroborate plaintiff's claim.

Although plaintiff argued that these deposits could not be principal repayments because it is counterintuitive to borrow and repay principal in the manner and time-frame defendant claims occurred, defendant provided plausible testimony explaining the pattern of payments. She explained that sometimes she borrowed money, repaid it, and borrowed more all in quick succession because of sudden, pressing business expenses like gas and insurance for her transportation company that would require her to ask for more money immediately. (Id. at 44). Her testimony is consistent with the bank statements that show a pattern of small, nonuniform, periodic payments to defendant, and payments of small, nonuniform amounts to plaintiff. (Ex. G at 1035; Ex. H).

Similarly, although plaintiff's counsel argues that the scratched out handwriting on the deposit slips reflects an attempt to conceal the true nature of the deposits as interest payments, he has supplied no reason, other than sheer speculation, to believe that the notes in fact reflect comments about interest payments to plaintiff. The defendant testified that she did not tamper with the slips and that she used these old deposit slips as note paper to write down things like telephone numbers that could have been later scribbled out. (Tr. at 48). This testimony seems just as likely, if not more likely than plaintiff's proposed theory that defendant purposefully scribbled out the text to hide evidence that these deposits were for interest.

19

The Court is also not persuaded by plaintiff's argument that the absence of signatures on the deposit slips means that defendant did not make these deposits. (Id. at 45-47). This argument that defendant did not make these deposits actually conflicts with plaintiff's own theory that these deposit slips reflect interest payments by defendant, as purportedly evidenced by her notes on the slips. Regardless, the evidence supports a finding that defendant made these deposits. First, defendant produced these slips to the Court, and there is no basis to believe that defendant obtained these slips from someone else and then attempted to pass them off as her own. Second, defendant's explanation that all of these deposits were made in Boston and thus were made either by defendant herself or by her family members, as opposed to those that were made by plaintiff in New York, was also reasonable. (Id. at 47). Substantiating this testimony, the branch codes on all but two of the deposit slips show that these deposits were made in Boston at the branch where the account maintained by Xuxa Transportation, Inc. (defendant's transportation business) and the joint account maintained by defendant and plaintiff are located. (Ex. G at 1027). The remaining two deposits were made at other branches in Massachusetts. (Id.) Finally, the one deposit slip that has a signature bears the signature of Hector Tirado, defendant's husband. (Tr. at 46, 56). This further corroborates defendant's testimony that she or her family members made these deposits to plaintiff's account. (Id. at 47).

The final factor that the Court has considered in determining that plaintiff has failed to show that there was an agreement to pay $2,500 interest on a monthly basis is the plaintiff's apparent decision not to request such interest now.[11] Based on a rough calculation if, in fact,

---

[11]Although plaintiff claimed at trial that the parties had agreed on interest payments of $2,500 per month (see Tr. at 19-20), there were only two occasions on which defendant deposited exactly $2,500 – February 11, 2008 and July 16, 2008. These two transactions alone certainly do

there was an agreement to pay $2,500 in interest, defendant would owe $92,500 in interest.[12]

Thus, after analyzing all of the testimony and evidence, the Court finds that plaintiff has failed to sustain her burden of proof on the agreement to pay interest, and that the deposits in the amount of $69,920 were principal repayments made by defendant to plaintiff. Accordingly, in determining the amount owed to plaintiff, the Court has subtracted the $69,920 in repayments from the stipulated amount loaned of $142,500.

## B.    Plaintiff's Cash Withdrawals

The second issue is whether plaintiff's three cash withdrawals totaling $17,900 are evidence of cash loans made to defendant, as plaintiff contends. Bank statements confirming that plaintiff made three cash withdrawals on July 17, 2008, January 28, 2010, and June 3, 2010, were entered into evidence. (Tr. at 11-13; Ex. A at 429; Ex. B at 405; Ex. C at 290; Ex. H). Plaintiff testified that these three withdrawals were all cash loans she made to the defendant. (Tr. at 11-13). She asserts that the January 2010 withdrawal of $10,000 was made in Massachusetts, where defendant resides. (Id. at 12). Plaintiff claimed that she withdrew this cash and gave it to defendant while she was visiting defendant in Boston on vacation. Plaintiff's counsel contended, without evidence, that plaintiff made no large purchases in Boston when she visited her sister, and therefore, the $10,000 cash withdrawal made in Boston during a visit with defendant could

_____

not constitute consistent monthly payments which would evidence a set interest agreement.

[12]This accounts for $2,500 per month in interest for the 37 months from May 2007 through June 2010, the earliest and latest dates for the loan referenced at trial. (Tr. at 4, 10). Even taking into account the $76,902 previously paid to plaintiff, which plaintiff claims was all interest, defendant would still owe an additional $15,598 in interest, which plaintiff does not appear to be claiming at this time.

not be anything other than a loan, especially given that "there [was] a loan going on back and forth" between plaintiff and defendant at this time. (Id. at 20-21, 55). The other two withdrawals were made in New York, where plaintiff resides. (Ex. A at 429; Ex. C at 290). Plaintiff claimed that these two withdrawals were evidence of loans to defendant when defendant came to New York to visit. (Tr. at 17-18).

Defendant categorically denied receiving any of these three cash withdrawals that plaintiff claimed were loans to defendant. (Id. at 22). She did not offer an alternative explanation for these withdrawals; she only stated that they were not loans to her.[13] (Id.)

The Court is not persuaded by plaintiff's testimony regarding the $10,000 Massachusetts cash withdrawal. Although there was a pattern of loans between plaintiff and defendant involving transfers of thousands of dollars, the defendant denied receiving this particular amount and there is no written evidence to confirm that the transfer actually occurred. While plaintiff's counsel argued that plaintiff would not have spent that much money on the trip, it is entirely plausible that she loaned or gave the money to someone other than the defendant – for example, her mother. Given that it is plaintiff's burden to establish that she loaned the money to defendant, the Court finds that she has failed to establish by a preponderance of the evidence that the $10,000 Massachusetts withdrawal was a loan to defendant.[14]

---

[13]Defendant's counsel argued that plaintiff was generous with her sister, and thus implied that these cash withdrawals could have been for some sort of gift or financial aid unrelated to the loan, but there was no testimony to support this argument. (Id. at 53). Moreover, plaintiff's counsel responded that although plaintiff was generous enough to buy small things like ice cream and food for defendant's children when she visited defendant, plaintiff's generosity cannot explain a $10,000 cash withdrawal in Boston. (Id. at 21-22, 55).

[14]Even plaintiff's own expert asserted that this amount was not supported by sufficient evidence. (Ex. G at 3, 5).

Although the parties discussed the Massachusetts withdrawal at length at trial, the New York withdrawals were barely mentioned at all. Plaintiff only testified that they occurred, that they were loans made to defendant when she visited New York, and that defendant denies receiving them. (Id. at 17-18, 22). There is nothing in the record, other than plaintiff's testimony, to suggest that these amounts were loaned to defendant and were not amounts used by plaintiff for other things. Given the conflicting testimony, the Court finds that plaintiff has not met her burden of proof with regards to the two New York withdrawals totaling $7,900.[15] Consequently, the Court finds that these two cash withdrawals were not loans to defendant.

## C. Plaintiff's Additional Alleged Cash Loans

The third issue is whether plaintiff made additional cash loans totaling $60,000 to defendant with cash that she saved at home, as plaintiff alleges, or whether these cash loans never occurred, as defendant contends. Plaintiff claims that the undocumented $60,000 came from patient payments at her husband's pediatric practice, where plaintiff serves as the practice administrator. (Tr. at 16-17). She claims that she periodically brought home cash in her role as the practice's administrator. (Id.) Plaintiff claimed that she used this cash to make loans to defendant over a period of five years. Usually, these amounts would be given to defendant when plaintiff would go on vacation to Boston or when defendant would visit New York. (Id.) Since this cash was not held in a bank, there are no bank statements showing withdrawals of this cash.

Defendant testified that none of these alleged cash loans occurred. (Id. at 22). While

_____

[15]Here, too, plaintiff's own expert report states that more evidence is required to ascertain that these transfers were made to defendant from plaintiff. (Ex. G at 3, 5).

cross-examining plaintiff, defendant's counsel pointed out that plaintiff had not provided any documentation to show that her husband's practice received this cash or that plaintiff held this cash at home. (Id. at 15). Plaintiff conceded that she has no "form of paperwork or documentation which would substantiate [the] claim" that she loaned defendant this $60,000 cash. (Id.) She testified that this $60,000 would have been recorded in her husband's business records as money received, and that she could have provided these records. (Id. at 17). However, plaintiff did not provide these records, or any other evidence to meet her burden of proof. Additionally, it is unusual to pay doctors in cash. Records confirming that plaintiff's husband received a steady stream of cash from his patients would have corroborated the credibility of plaintiff's testimony regarding this issue, but plaintiff chose not to call her husband to testify. Plaintiff criticized the defendant for failing to call defendant's mother to testify about defendant's alleged $7,000 cash repayment. (See discussion infra at 23). Plaintiff has similarly failed to provide any corroborating testimony regarding her alleged $60,000 undocumented cash loans.

Given that plaintiff has provided no evidence to substantiate her testimony that $60,000 was allegedly taken in cash from her husband's pediatric practice, held at her home, and eventually loaned to defendant, the Court does not credit plaintiff's claim that the $60,000 in question was a loan to defendant.


D.     Defendant's Alleged Cash Repayment

The final issue is whether defendant made a $7,000 cash repayment to plaintiff. Defendant claimed that she made one cash repayment of $7,000 to plaintiff when plaintiff visited

24

defendant's home. (Tr. at 23). Defendant testified that her assistant, Yolobrina Saldana, and her mother, Zulena Calcano, were witnesses to this repayment, which allegedly occurred in defendant's son's room. (Id. at 23, 26). However, these witnesses were not called to testify at trial. Defendant also stated that she could not provide records to confirm that she made this repayment. (Id. at 26).

Plaintiff contends that this alleged cash repayment did not occur. (Id. at 15). Furthermore, plaintiff's counsel argued that defendant's testimony regarding this cash repayment is not credible because it is internally inconsistent. When questioned, defendant testified that her mother was a witness to this $7,000 repayment that allegedly occurred before this lawsuit was initiated. (Id. at 26). However, defendant also testified that her mother did not find out about the loan agreement between plaintiff and defendant until plaintiff initiated the lawsuit in 2012. (Id. at 27). Plaintiff's counsel pointed out this inconsistency, asking "how could [her mother] have been present for the repayment and known all about it" if her mother only found out about the loan "after the case started." (Id. at 56-57).

The Court finds that this inconsistency is persuasive in casting doubt upon the credibility of defendant's testimony regarding this cash repayment. It is defendant's burden to prove by a preponderance of the evidence that this repayment occurred. Defendant's testimony is the only evidence provided to substantiate defendant's claim about this cash repayment. There is no further documentation or witness testimony showing that this repayment occurred. Accordingly, the Court finds that defendant did not repay plaintiff this $7,000 in cash.

25

III.    Prejudgment Interest

Plaintiff asks for prejudgment interest in her Complaint. (Compl. ¶ 6). Under New York State law, interest is recoverable for general civil judgments involving a breach of contract. The method for calculating pre-judgment interest is set forth in N.Y. CPLR § 5001, which provides that interest shall be calculated at the non-compounded rate of 9% per annum, CPLR §§ 5001(a), 5004, and that "[i]nterest shall be computed from the earliest ascertainable date the cause of action existed." Id.

It is unknown when exactly plaintiff first demanded repayment. (Tr. at 14). Thus, the earliest ascertainable date the cause of action existed is the day the Complaint was filed, February 2, 2012. Calculating prejudgment interest at a rate of 9%, or a daily rate of 0.021918%, the Court calculates interest in the amount of $16,669.48, based on total damages of $72,580 over the 932 days since the Complaint was filed.


CONCLUSION

The Court finds that plaintiff is entitled to repayment on her loan to defendant, as follows:

| | |
|---|---|
| Stipulated Loan | + $142,500.00 |
| Defendant's Deposits into Plaintiff's Account as Repayment | − $69,920.00 |
| Prejudgment Interest | + $16,669.48 |
| **Total** | **$89,249.48** |


Accordingly, the Court finds in favor of plaintiff Minerva Schlamowitz. The Clerk is directed to enter judgment in favor of Minerva Schlamowitz in the amount of $89,249.48 along

26

with any post-judgment interest that accrues from the date that judgment is entered.

The Clerk is further directed to send copies of this Memorandum and Order to the parties either electronically through the Electronic Case Filing ("ECF") system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
August 22, 2014

/s/ Cheryl L. Pollak

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York